UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,

         Plaintiff,

    v.

ROSE M. MARTINEZ,

         Defendant.

No. CR-06-2198-FVS

ORDER

**THIS MATTER** came before the Court for a hearing on March 7, 2008 on the Defendant's Motion For Acquittal and Alternatively for New Trial, Ct. Rec. 108. Assistant United States Attorney Joseph H. Harrington appeared on behalf of the United States. The Defendant was present and represented by J. Jarrette Sandlin.

The Defendant moves for a verdict of acquittal on the Counts of Health Care Fraud of which she was convicted (Counts 1-3 and 6-10), the Counts of Health Care Fraud upon which the jury failed to reach a verdict (Counts 11-13), and the Counts of Unlawful Distribution of a Controlled Substance upon which the jury failed to reach a verdict (Counts 14 and 15). In the alternative, the Defendant requests a new trial.

The Government has failed to present evidence that would enable a rational trier of fact to find beyond a reasonable doubt that the Defendant had the necessary intent to distribute a controlled

ORDER- 1

substance "outside the course of professional practice."  The Defendant's request for a verdict of acquittal on Counts 14 and 15 will accordingly be granted.  The Government did introduce evidence in support of each element of the crime of Health Care Fraud.  Under the stringent standard of Federal Rule of Criminal Procedure 29, the motion for acquittal as to Counts 1-3, Counts 6-10, and Counts 11-13 must therefore be denied.

However, the jury's verdict on Counts 1-3 and Counts 6-10 is so contrary to the weight of the evidence presented at trial that to let it stand would be a miscarriage of justice.  The Defendant's request for a new trial will therefore be granted as to Counts 1-3 and Counts 6-10.  The Defendant has not directly addressed the substantive issues involved in Counts 11-13.  Given that the jury did not reach a verdict on these counts, the Court finds it appropriate to retry these charges along with Counts 1-3 and Count 6-10.

**BACKGROUND**

**Health Care Fraud**

Counts 1-3, Counts 6-10, and Counts 11-13 of the Indictment charge the Defendant with executing a scheme to defraud three health care benefit programs: the Medicare Part B program, the Washington Medicaid program, and the Washington L&I program.  Indictment, Ct. Rec. 1, at 9.  Specifically, the Indictment alleges that the Defendant "submitted or caused to be submitted claims for reimbursement to the health care benefit programs which contained CPT codes for services not rendered to patients."  Indictment, Ct. Rec. 1, at 10.  Counts 1-3 and Counts 6-10 allege that the Defendant sought reimbursement for

ORDER- 2

Level 5[1] services when, in fact, she had actually provided Level 3 services.  Indictment, Ct. Rec. 1, at 10-11.  Counts 11-13 allege that the Defendant improperly submitted claims for services that were performed by her physician's assistant without the supervision required by Medicare's "incident to" rule.  *Id.* at 11; Trial Transcript, Ct. Recs. 118-125, ("Transcript II") at 1549-52.

At trial, the Government presented evidence that the documentation the Defendant submitted to the health care benefit programs did not substantiate her request to be paid for Level 5 services.  First, the Government presented the testimony of Cindy Steedman, a Medical Review Claims Analyst contracted to investigate potential fraud for Medicare.  Transcript II at 285.  Ms. Steedman testified that she reviewed the Defendant's chart notes for the three office visits that formed the basis for Counts 7-9 of the Indictment. She concluded that "the documentation supported" Level 3 services, rather than Level 5 services.  Ms. Steedman explained that the level of billing permitted is dependent upon the level of documentation provided:

> Well, documentation has to show that each of these items are -- have been performed or documented. We review the record, and it's based on what documentation is in there. If a provider is billing 99215, we expect to see two of the three items on the list in the CPT book, which would be a comprehensive history, comprehensive exam and medical decision-making of high complexity. If we don't see that, we give the provider credit for seeing the patient if we have

---

[1]The "Level" of services provided refers to the billing codes established by the American Medical Association, known as the "Physician's Current Procedural Terminology" ("CPT").  A more comprehensive explanation of the CPT codes at issue in this case can be found elsewhere in the record.

ORDER- 3

>notes, but we may have to bump the code down a level or two levels.

*Id.* at 302.

Second, the Government presented the testimony of Brenda Boles, a claims auditor for Washington L&I. Transcript II at 341. Ms. Boles testified that she reviewed the Defendant's chart notes for the office visit that formed the basis for Count 10 of the Indictment. Ms. Boles explained that she "downcoded" the Defendant's bills because the Defendant's chart notes did not "meet the code that she billed." *Id.* at 347.

Third, the Government presented testimony from Sandra Knapp, a Certified Fraud Examiner for Washington Medicaid. Transcript II at 377. Ms. Knapp testified that she reviewed the Defendant's chart notes for the four office visits that formed the basis for Counts 1-3 and 6 of the Indictment. *Id.* at 396. Ms. Knapp concluded that "the documentation in the client charts did not support billing" for Level 5 services. *Id.* at 397-99. Ms. Knapp explained that "her job" is to compare the amount that was billed to Medicaid with "the documentation in the client chart to see if, first, if the documentation is there, and if it is there, does it support the level of service that the provider billed to the department." *Id.* at 379.

The Government also introduced evidence that, in 1999 and 2000, the Defendant was audited for certain claims she had submitted to Medicare. Transcript II at 484-86; 1518-21. As a result of the audit, the Defendant received educational materials regarding CPT codes and "the elements that should be involved in billing particular services." *Id.* at 484-86. After the 2000 audit, the Defendant

ORDER- 4

attended a course entitled "Documentation: the Key to Quality Payment," where she was "taught about how to make the documentation for billing, yes, but not for quality." *Id*. at 1572. On cross-examination, the Defendant acknowledged that she has studied, has reviewed, and knows the CPT codes and is aware that the CPT manual requires "the basic documentation." Transcript II at 1544, 1578.

**Unlawful Distribution of a Controlled Substance**

Counts 14 and 15 of the Indictment charge the Defendant with the unlawful distribution of a controlled substance. Specifically, Counts 14 and 15 allege that the Defendant prescribed Methadone to a patient, S.M., "for other than a legitimate medical purpose and outside the usual course of professional practice." Indictment, Ct. Rec. 1, at 12-13.

At trial, the Government presented testimony from Dr. Gordon Irving, a pain specialist. Trial Transcript, Ct. Rec. 70, ("Transcript I") at 15. Dr. Irving testified that Methadone is both an "effective painkiller" and "a very good drug for addiction purposes . . . it fills up those receptors that are craving the heroin, and your craving goes down." *Id.* at 18. Dr. Irving opined that, "unless one is an addictionologist working in a Methadone clinic," the distribution of Methadone for addiction maintenance is outside "the purview of medical practice as far as I'm aware." *Id.* at 24. Based on a review of S. M.'s charts, Dr. Irving concluded that the Defendant prescribed Methadone to S.M. for addiction maintenance. *Id.* at 23-24.

Dr. Irving's conclusions and opinions were refuted by the Defendant's expert, Dr. Alexander DeLuca, an expert in addictionology

ORDER- 5

and pain management.  Transcript II at 1285-86.  Dr. DeLuca opined that the Defendant prescribed Methadone for a legitimate medical purpose and within the usual course of medical practice because "there were clear medical indications for chronic opioid therapy." *Id.* at 1327-1335.  Dr. DeLuca further testified that, while it is generally accepted in the medical profession that drugs like Methadone may be safely used in high doses to treat pain, "there is, in one sense, a lot of controversy about chronic pain therapy" arising out of "cultural, political, and regulatory concerns."  *Id*. at 1312-1315.

**DISCUSSION**

**I.   MOTION FOR JUDGMENT OF ACQUITTAL**

The trial court must enter a judgment of acquittal "of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  A motion for acquittal made or considered after the jury has returned a guilty verdict should be denied if, "viewing the evidence in the light most favorable to the government, a rational trier of fact could have found the defendant guilty beyond a reasonable doubt."  *United States v. Hector*, 474 F.3d 1150, 1156 (9th Cir. 2007)(citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).

**A.   Unlawful Distribution of a Controlled Substance**

In order to convict a physician of Unlawful Distribution of a Controlled Substance, the Government must prove three elements beyond a reasonable doubt:

> (1) that the practitioner distributed controlled substances,
> (2) that the distribution of those controlled substances was outside the usual course of professional practice and without a

ORDER- 6

>legitimate medical purpose, and
>
>>(3) that the practitioner acted with intent to distribute the drugs and with intent to distribute them outside the course of professional practice.

*United States v. Feingold*, 454 F.3d 1001, 1008 (9th Cir. 2006). Criminal liability for distribution of a controlled substance may not be imposed upon a physician on the basis of malpractice, even intentional malpractice, alone. Rather, a physician may be convicted under 21 U.S.C. § 841(a)(1) if his or her "actions completely betrayed any semblance of legitimate medical treatment." *Id.* at 1010. A physician who "earnestly adhered to some alternative, but nonetheless medically legitimate standard of care" may thus not have the requisite intent to be convicted of the Unlawful Distribution of a Controlled Substance. *Id.* at 1012-1013.

While the evidence presented at trial was sufficient to satisfy the first element of the crime at issue, it fell considerably short of proving the second and the third. It is undisputed that the Defendant, as a practicing physician, distributed controlled substances.

Turning to the second element, a rational jury could find Dr. Irving to be more credible than Dr. DeLuca and thereby conclude that the Defendant's prescription of Methadone to S. M. amounted to malpractice. However, *Feingold* is clear that a physician may not be convicted upon the basis of malpractice alone, whether unintentional or intentional. The testimony of Dr. Irving and Dr. DeLuca illustrates that there is a genuine difference of opinion in the medical community concerning the use of drugs like Methadone to manage

ORDER- 7

pain. Unlike Dr. Feingold, Dr. Martinez "earnestly adhered to some alternative, but nonetheless medically legitimate, standard of care." *Id.* at 1012-13. Upon this record, no rational jury could find that she "completely betrayed any semblance of legitimate medical treatment." 454 F.3d at 1010.

Moreover, the record contains no evidence that would support the inference that Dr. Martinez intended "to act as a pusher rather than a medical professional." *Feingold*, 454 F.3d at 1008. While Dr. Irving disagreed with the Defendant's practices, he did not attempt to speak to her state of mind. Nor has the Government cited to any other evidence in the record from which a rational jury could infer that Dr. Martinez intended to engage a medically illegitimate practice.

The Government thus failed to introduce sufficient evidence to persuade a rational jury that the Defendant distributed Methadone outside the usual course of professional practice. Nor did it prove that the Defendant had the necessary mens rea to commit the crime of Unlawful Distribution of a Controlled Substance. Given these evidentiary inadequacies, a judgment of acquittal will be entered on Counts 14 and 15.

**B.   Health Care Fraud**

In order for a defendant to be convicted of the crime of Health Care Fraud, the Government must prove four elements beyond a reasonable doubt:

   1) The Defendant knowingly and willfully executed a scheme to defraud a health care benefit program;

   2) The Defendant executed the scheme with the intent to defraud;

ORDER- 8

      3) The claims submitted in furtherance of the scheme were material, that is they would reasonably influence a health care benefit program to part with money or property; and

      4) The Defendant executed the scheme in connection with the delivery of payment for health care benefits or services.

It is not seriously disputed that the Government presented sufficient evidence to establish the two latter elements. At trial, Bryan Danielson, Patsy Ingle, and Sigrum Mulligan testified that the Defendant submitted claims to various health care benefit programs and received payment for the claims. Transcript II at 475-482, 521-533, 545-548. On the basis of this testimony, a rational jury could conclude that the conduct at issue, submitting claims for payment, was connected to the delivery of health care services. Given that the claims were paid, the jury could also conclude that the claims were material.

The issues now before the Court are whether the Defendant engaged in a scheme to defraud and whether she had the intent to defraud.

**1.  Scheme to defraud**

The Defendant argues that the Government is prosecuting her for "bad charting," rather than any deficiency in the health care she provided. 18 U.S.C. § 1347 makes it a crime to defraud a health care benefit program. By definition, fraud of any kind involves deceit. If the Defendant did, in fact, provide the services for which she billed, she would not be guilty of Health Care Fraud, no matter how incomplete or illegible her charting. The Indictment assumes as much. It alleges that Dr. Martinez billed the health care benefit agencies for "services not rendered to patients." Indictment, Ct. Rec. 1, at 10. It does not attempt to premise criminal liability on perceived

ORDER- 9

documentation insufficiencies.

Giving the Government the benefit of every possible inference, the evidence introduced at trial could theoretically support the inference that the Defendant did not provide the services for which she billed. Based on the testimony of Steedman, Boles, and Knapp, a rational jury could find that the Defendant did not provide sufficient documentation to bill for Level 5 services. Based on the testimony of Danielson and the Defendant herself, a rational jury could also find that the Defendant knew how to document her services in a manner that would enable her to be paid for Level 5 services. Assuming the jury made both of these findings, the jury could then infer that the Defendant's charts reflected the nature and extent of the services she provided. In other words, "not charted, not done." Through this chain of inferences the jury could theoretically conclude that the Defendant engaged in a scheme to defraud the Government.

### 2. Intent to defraud

Of necessity, the intent to defraud may be inferred from circumstantial evidence. *United States v. Boesen*, 491 F.3d 852, 857 (8th Cir. 2007); *United States v. Singh*, 390 F.3d 168, 188 (2d Cir. 2004). Inferences of willfulness may be drawn from "efforts to conceal the unlawful activity, from misrepresentations, from proof of knowledge, and from profits." *United States v. Dearing*, 504 F.3d 897, 901 (9th Cir. 2007)(quoting *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007)).

Drawing all reasonable inferences in favor of the Government, a rational jury could conclude that the Defendant acted with the intent

ORDER- 10

to defraud.  As explained above, the Government introduced evidence from which a jury could infer that the Defendant continued to bill for Level 5 services after she knew that her charting did not support this level of services.  Transcript II at 485-86, 1532-35, 1572.  Assuming again that the Defendant's charts were an accurate reflection of the services she provided, the jury could conclude that she intended to obtain payment for services that she did not provide.  Under Rule 29, the Court can not grant the Defendant's request for a verdict of acquittal on Counts 1-3 and Counts 6-10.

**II.    MOTION FOR NEW TRIAL**

Pursuant to Federal Rule of Criminal Procedure 33(a), a trial court may vacate a judgment and grant a new trial "when justice so requires."  Consistent with this principle, the Court may grant a new trial if the jury's verdict is contrary to the weight of the evidence, resulting in a miscarriage of justice.  *Id*. (citing *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)).  As a matter entrusted to the discretion of the trial judge, a motion for a new trial should be granted only in "exceptional cases in which the evidence preponderates heavily against the verdict."  *United States v. Pimental*, 654 F.2d 538, 545 (9th Cir. 1981).

The standard to be applied to a motion for a new trial differs significantly from the standard governing a motion for acquittal.  In evaluating a motion for acquittal, a court must be  "highly deferential" to the jury's verdict.  *Dearing*, 504 F.3d at 900.  It may neither weigh the evidence nor assess the credibility of witnesses.  *United States v. Beverly*, 369 F.3d 516, 532 (6th Cir.

ORDER- 11

2004).  In contrast, a court evaluating a motion for a new trial "is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses."  *United States v. Kellington*, 217 F.3d 1084, 1094-95 (9th Cir. 2000).

The jury's verdict in this case is not only contrary to the weight of the evidence, it is flatly contradicted by the evidence. Specifically, the weight of the evidence preponderates heavily against the conclusion that the Defendant engaged in a scheme to defraud and against the conclusion that she acted with the intent to defraud.

**A.   Scheme to Defraud**

The Defendant is accused of perpetrating a scheme to defraud by billing for services that she did not provide.  A substantial body of evidence indicated that the Defendant did, in fact, provide Level 5 health care services.  Dr. Martinez explained her billing decisions. Her patients, Cheryl Antunez, Marvin Kosmatka, and Sharon Miles, verified that they suffered complex medical problems.  Transcript II at 556-569, 577-85, 642-53.  James Edwards and Ruth Anderson confirmed that Dr. Martinez spent significant periods of time with them. Transcript II at 952-71, 995-1005.  Based on his review of the Defendant's charts, Dr. Irving agreed that Dr. Martinez must have spent an average of 15-30 minutes with each patient.  Transcript I at 60.  Thus, seven witnesses other than the Defendant herself, two of them experts, three called by the Government, presented testimony inconsistent with the existence of a scheme to defraud.

The Government did not introduce any evidence concerning the

ORDER- 12

services Dr. Martinez actually provided.  Rather, the testimony of the Government's auditors revealed that Dr. Martinez's bills were downcoded on the basis of alleged charting deficiencies.  Transcript II at 308, 322, 399, 404.  However, the evidence supporting the existence of the alleged charting deficiencies is inconclusive.  Both Steedman and Knapp indicated that they had difficulty reading the Defendant's handwriting.  Steedman stated, "Well, in these records, the handwriting was very hard to read.  Most of the time I was able to decipher it."  Transcript II at 311.  Knapp complained that a chart note was "scribbled," and declared, "Chart notes are supposed to be legible.  I try to read them to the best of my ability."  *Id.* at 420.  Knapp also admitted that, contrary to her usual practice, she did not obtain a key to help her in interpreting Dr. Martinez's abbreviations.  *Id.* at 419-20.  Two of the three auditors thus downcoded the Defendant's bills without completely understanding everything that the supporting documentation contained.

More importantly, the Government's case relied upon the assumption that a service not charted was, in fact, not performed.  While this assumption is presumably useful to the health care benefit programs in making payments, it is neither a rule of law nor a rule of logic.  Dr. DeLuca indicated that the purpose of a medical chart is to refresh the charting's physician's memory on future occasions.  Transcript II at 1334.  In that case, a detailed recitation of every step taken during an examination would not be necessary.  Consequently, the "not charted, not done" assumption may be inconsistent with the reality of how medicine is practiced.  Weighed

ORDER- 13

against the substantial body of evidence summarized above, the fact that the Defendant's chart notes did not comply with the expectations of three auditors does not prove the existence of a scheme to defraud beyond a reasonable doubt.

**B.   Intent to Defraud**

The evidence presented at trial also preponderates heavily against the conclusion that the Defendant had the intent to defraud the health care benefit programs.  As a primary matter, the Defendant's own testimony refutes this conclusion.  On cross-examination, the Defendant vigorously defended her decision to bill for Level 5 services and her belief that her record-keeping practices are consistent with "the best interest of medicine."  Transcript II at 1333-35, 1544-45.  Even if the Defendant did not provide Level 5 services, her testimony indicates that she believed she did.

Weighed against the Defendant's testimony, the evidence presented at trial was insufficient to prove the existence of fraudulent intent beyond a reasonable doubt.  The only evidence suggestive of fraudulent intent consisted of testimony that the Defendant knew how to make her chart notes conform to the expectations of the health care benefit programs.  As explained previously, the jury could theoretically conclude, on the basis of this knowledge, that the Defendant's allegedly insufficient chart notes demonstrate the intent to defraud.  However, this is not a necessary conclusion.  One could just as easily conclude that a doctor who intended to receive payment for services that he or she did not provide would make every effort to conform to the charting expectations of program auditors.  Permitting a

ORDER- 14

conviction to stand based entirely on such intangible evidence of fraudulent intent would be an injustice.  A new trial is therefore appropriate.

**III. DOUBLE JEOPARDY**

Consistent with the double jeopardy clause of the Fifth Amendment, the Government may criminally indict an individual for "essentially the same conduct" that formed the basis for previously imposed civil sanctions.  *Hudson v. United States*, 522 U.S. 93, 95, 118 S. Ct. 488, 491, 139 L. Ed. 2d 450, 456 (1997).  It may not, however, "impose multiple criminal punishments for the same offense." *Id*. at 99, 118 S. Ct. at 493, 139 L. Ed. 2d at 458-59.

The Defendant argues that the Health Care Fraud counts should have been dismissed on the basis of double jeopardy because she has already paid fines approximately ten times the amount of the alleged overpayments.  It is true that the Defendant paid $45,000 back to Medicare following the 2000 audit.  Transcript II at 1518.  However, the office visits underlying the Health Care Fraud counts in the Indictment post-date the 2000 audit, the earliest office visit at issue having occurred on January 7, 2002.  The charges in the Indictment thus do not concern the same conduct for which the Defendant was audited in 2000.  In view of this fact, the Court need not reach the question of whether the penalties imposed in 2000 were civil or criminal in nature.  Double Jeopardy does not require dismissal of the Health Care Fraud claims.

The Court being fully advised,

ORDER- 15

**IT IS HEREBY ORDERED:**

1. The Defendant's Motions For Acquittal and Alternatively for New Trial, **Ct. Rec. 106**, is **GRANTED IN PART** and **DENIED IN PART**.

2. The Defendant's Motion For Extension of Time, **Ct. Rec. 126**, is **GRANTED**.

3. The District Court Executive is directed to enter a **JUDGMENT OF ACQUITTAL** on Counts 14 and 15 of the Indictment.

4. There will be a new trial on Counts 1-3, Counts 6-10, and Counts 11-13.

**IT IS SO ORDERED.** The District Court Executive is hereby directed to enter this order and furnish copies to counsel.

**DATED** this  25th  day of March, 2008.

                    s/ Fred Van Sickle
                    Fred Van Sickle
          United States District Judge

ORDER- 16